# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NASHVILLE SENIOR CARE, LLC, | ) | |
| *et al.*[1] | ) | Case No. 23-02924 (MFH) |
| | ) | |
| *Debtors*. | ) | Jointly Administered |
| | ) | |

_____

| | | |
|---|---|---|
| NASHVILLE SENIOR CARE, LLC, | ) | |
| CINCINNATI SENIOR CARE, LLC, | ) | |
| DAYTON SENIOR CARE, LLC, | ) | |
| FLORIDA SENIOR LIVING, LLC, | ) | |
| SEBRING SENIOR LIVING, INC., and | ) | |
| WAYNESBORO HEALTHCARE, LLC, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Adv. Pro. No. 3:24-ap-90022 |
| | ) | |
| v. | ) | |
| | ) | |
| NEXUS CAPITAL XIII, LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |

---

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF DEFENDANT NEXUS CAPITAL XIII, LLC TO PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

Defendant Nexus Capital XIII, LLC ("Nexus"), by its attorneys, Foley & Lardner, LLP

and Burr & Forman, LLP, for its Answer, Affirmative Defenses and Counterclaim to the

Complaint of plaintiffs Nashville Senior Care, LLC, Cincinnati Senior Care, LLC, Dayton Senior

Care, LLC, Florida Senior Living, LLC, Sebring Senior Living, Inc., Trousdale Issuer, LLC, and

---

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases are: Nashville Senior Care, LLC; Cincinnati Senior Care, LLC; Dayton Senior Care, LLC; Florida Senior Living, LLC; Sebring Senior Living, Inc.; Trousdale Issuer, LLC; and Waynesboro Healthcare, LLC.

Waynesboro Healthcare, LLC (together "<u>Debtors</u>" or "<u>Plaintiffs</u>" or "<u>Plaintiffs-Counterdefendants</u>"), states the following.

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs own and operate residential senior care and nursing facilities and provide related healthcare services at various locations throughout the country. Unfortunately, Plaintiffs' business operations encountered a massive disruption from the COVID-19 pandemic that, when paired with their debt obligations, ultimately could not be overcome. After months of marketing, Plaintiffs accepted a bid from Cascasis LLC ("Cascasis") for the purchase of substantially all of Plaintiffs' assets. Plaintiffs and Cascasis entered into an Asset Purchase Agreement dated August 4, 2023 (the "Stalking Horse APA") and initiated the above-captioned cases under chapter 11 of the Bankruptcy Code on August 14, 2023 in order to facilitate the sale to Cascasis or the highest and best bidder to be identified pursuant to a court-approved overbid and auction process.

<u>ANSWER:</u>  Nexus admits that Plaintiffs own and operate residential senior care and nursing facilities and provide related healthcare services at various locations throughout the country. Nexus also admits that Plaintiffs accepted Cascasis' bid and entered into the Stalking Horse APA and initiated the above-captioned cases under chapter 11 of the Bankruptcy Code on August 14, 2023. Nexus denies the remaining allegations of paragraph one for lack of knowledge. Nexus states affirmatively that Plaintiffs thereafter, on October 23, 2023, entered into an Asset Purchase Agreement with Nexus (the "<u>APA</u>"), that Nexus' bid was 40% higher than the Stalking Horse APA, and that Nexus also deposited four times (or $6 million) more than Cascasis did. Nexus also states affirmatively that on October 23, 2023, Plaintiffs moved the Court to approve that APA with Nexus as the highest and best bid, and advised the Court that, in light of this, a private sale to Nexus should go forward and that no overbid or auction process was necessary. Nexus further states affirmatively that on November 8, 2023, the Court approved Plaintiffs' motion to proceed with the APA as the highest and best bid, finding this was in the best interests of the Debtors' estate and its creditors. (*See* Dkt. 366). Since that time, however, Plaintiffs have attempted to sabotage the closing of the APA with Nexus by, among other things, failing to ensure that one of the six facilities

4866-2791-9781.1

which are subject to the APA—McKendree Village in Hermitage, Tennessee ("McKendree Village")—has a viable license to operate from the Centers for Medicare and Medicaid Services ("CMS"). Instead McKendree Village has failed a survey and re-survey by CMS, has dire life safety issues, and is on the termination track by CMS unless its Plan of Correction is approved by April 4, 2024. Plaintiffs have further sabotaged Nexus' attempts to close the APA by: a) failing to obtain and provide to Nexus materials required for Nexus to obtain change of ownership ("CHOW") approvals by the Ohio Department of Health for the two Ohio facilities which are subject to the APA, including an HVAC Report, resulting in Nexus' CHOW application being denied as incomplete; b) failing to provide other necessary and requested documentation to Nexus;[2] c) surreptitiously pursuing a collusive deal with Cascasis on sweetheart terms denied to Nexus; and d) intentionally converting Nexus' Deposit.

2.      Prior to the scheduled auction, Nexus Capital submitted a preemptive bid that exceeded Cascasis's offer by approximately forty percent, but such bid was conditioned on Plaintiffs cancelling the scheduled auction. Nexus Capital also offered to pay an $8 million deposit into an escrow account (as compared to the $2 million deposit funded by Cascasis) as an additional incentive for Plaintiffs to accept the Nexus Capital bid, cancel the auction scheduled in the bankruptcy cases and not move forward with the Stalking Horse APA.

**ANSWER:**  Admitted.

3.      Plaintiffs subsequently accepted Nexus Capital's private sale bid, entered into that certain Asset Purchase Agreement dated October 23, 2023 (the "Nexus APA") with Nexus Capital (which had funded $7.25 million of the deposit into escrow), cancelled the upcoming auction, and filed a motion with the Court seeking approval of the private sale to Nexus Capital in accordance with the terms of the Nexus APA. The Court approved the sale to Nexus Capital in accordance with the terms of the Nexus APA, and Nexus Capital funded the remaining $750,000.00 into the escrow account.

---

[2] Capitalized terms used, but otherwise undefined herein, have the meaning set forth in the order approving the APA and the sale of Debtors' businesses pursuant to, in part, 11 U.S.C. § 363 (the "Sale Order"). (*See* Dkt. 366).

4866-2791-9781.1

**ANSWER:** Admitted.

4. In the intervening months, Nexus Capital repeatedly breached, and failed to fulfill its obligations under, the Nexus APA, including failing to timely file the regulatory approvals necessary to run Plaintiffs' facilities that would allow a closing to occur within the timeframe established in the Nexus APA. Rather than remedy its many breaches (of which ample notice was provided), Nexus Capital allowed the Condition Satisfaction Date, *i.e.* February 6, 2024, to lapse without compliance and without seeking to extend such date.

**ANSWER:** Denied. Nexus states affirmatively that Plaintiffs were the first breaching party. While

insisting that Nexus close on the APA by March 1, 2024, Plaintiffs sabotaged any ability of Nexus

to close the transaction, as described more fully in Nexus' answer to Paragraph 1 above and in

Nexus' Counterclaim below. At the same time, as Plaintiffs were preventing a closing with Nexus,

they were surreptitiously negotiating with Cascasis to enter into a rival asset purchase agreement,

even going so far as offering Cascasis sweetheart terms they would not offer Nexus. Once Plaintiffs

came to terms with Cascasis on the Third Amendment to Asset Purchase Agreement, dated

February 6, 2024 (the "Third Amendment"), (*see* Dkt. 516), Plaintiffs attempted to convert Nexus'

Deposit, seeking to seize the entire $8 million for themselves.

5. Consequently, on February 7, 2024, Plaintiffs exercised their termination rights under the Nexus APA as a result of Nexus Capital's failure to fulfill its obligations. Plaintiffs also asserted their rights under the Nexus APA to retain the full amount of the Escrow Deposit as liquidated damages for Nexus Capital's effective termination of and breaches under the Nexus APA. Nexus Capital, however, objected to Plaintiffs' termination and receipt of the Escrow Deposit, so the funds are being held by the Escrow Agent subject to further order of the Court.

**ANSWER:** Denied. Nexus states affirmatively that Plaintiffs had no legal right to terminate.

Nexus states that Plaintiffs had breached the APA by sabotaging Nexus' ability to close, as detailed

more fully in Nexus' answer to Paragraph 1 above and the Counterclaim below. At the same time

as Plaintiffs were preventing a closing with Nexus, they were surreptitiously negotiating with

Cascasis to enter into a rival asset purchase agreement, offering it sweetheart terms they would not

4

offer Nexus. Plaintiffs then attempted to convert Nexus' Deposit, seeking to seize the entire $8 million for themselves.

6.     As such, a bona fide dispute exists between the parties.  Plaintiffs seek a declaratory judgment that Plaintiffs are entitled to retain the Escrow Deposit of $8 million presently held pursuant to the terms of the Nexus APA and related Escrow Agreement as damages for Nexus Capital's breaches of the Nexus APA.

**ANSWER:**

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and Section 9.10(b) of the Nexus APA.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

**ANSWER:**     Admitted. This jurisdiction extends to Nexus' affirmative defenses and counterclaim—each set forth below—as well.

8.     Venue is proper under 28 U.S.C. § 1409 and Section 9.10(b) of the Nexus APA.

**ANSWER:**     Admitted. This venue extends to Nexus' affirmative defenses and counterclaim—each set forth below—as well.

9.     The Court may determine interests in property and grant the requested declaratory relief pursuant to 28 U.S.C. § 2201(a) and 11 U.S.C. § 105(a), and such relief is properly sought in an adversary proceeding pursuant to Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure.

**ANSWER:**   Nexus denies that Plaintiffs are properly seeking any relief or that Plaintiffs have brought a proper adversary proceeding. The remaining allegations state a legal conclusion to which no responsive pleading is required.

10.     Nexus Capital has consented to the jurisdiction of the Court pursuant to Section 9.10(b) of the Nexus APA and in accordance with Paragraph 59 of the Sale Order.

**ANSWER:**  Admitted.


## THE PARTIES

11.     Each Plaintiff is a limited liability company or corporation organized under the laws of the State of Tennessee or Florida, as applicable.

**ANSWER:**  Nexus denies the allegations of Paragraph 11 for lack of knowledge.


12.     Upon information and belief, defendant Nexus Capital is a limited liability company organized under the laws of the state of Delaware.

**ANSWER:**  Admitted.


## BACKGROUND

13.     Plaintiffs are engaged in the business of the ownership and operation of residential senior care and nursing facilities and the provision of related healthcare services at various locations throughout the country (collectively, the "Facilities"). Their business operations are regulated by local, state, and federal law and are conducted under licenses issued by Ohio, Tennessee, and Florida.

**ANSWER:**  Admitted.


14.     Plaintiffs were severely impacted by the COVID-19 pandemic, which caused a decline in the resident census across all of the Facilities.  But, even before COVID-19, Plaintiffs experienced liquidity issues and rising healthcare costs, leaving them unable to complete necessary capital expenditures and upgrade certain Facilities.

**ANSWER:**  Nexus denies the allegations of Paragraph 14 for lack of knowledge.


15.     The COVID-19 pandemic had a negative impact across the Facilities.  After the initial spate of lockdowns in the spring of 2020, resident census declined negatively impacting revenues.

4866-2791-9781.1

**ANSWER:**  Nexus denies the allegations of Paragraph 15 for lack of knowledge.

16.     Moreover, both operating and labor costs rose dramatically following the onset of the pandemic, which exacerbated the negative liquidity impact of the decline in census levels. Plaintiffs were unable to make needed capital investments and operational expenditures at certain of their Facilities, which impaired their ability to improve financial performance.  This difficult combination of rising costs and a lower census, coupled with a high debt load from their financing, led Plaintiffs to pursue strategic alternatives to maximize value.

**ANSWER:**  Nexus denies the allegations of Paragraph 16 for lack of knowledge.

17.     In July 2022, Plaintiffs retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as their investment banker to assist with strategic alternatives.

**ANSWER:**  Admitted.

18.     Beginning in September 2022, Houlihan Lokey engaged in a prepetition marketing process with potential strategic and financial buyers to solicit interest in Plaintiffs' business.  After a thorough pre-petition marketing process, Plaintiffs received an actionable offer from Cascasis.

**ANSWER:**  Nexus denies that the offer received from Cascasis was "actionable," on the grounds

that this term is vague and ambiguous. Nexus otherwise admits the allegations of Paragraph 18.

19.     On August 4, 2023, Plaintiffs and Cascasis entered into the Stalking Horse APA under which Cascasis agreed to purchase substantially all of Plaintiffs' assets for $41,000,000.00, subject to higher and better offers.

**ANSWER:**  Admitted.

20.     On August 14, 2023, Plaintiffs filed voluntary petitions for relief under chapter 11 title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") to, among other things, facilitate the sale of Plaintiffs' business to Cascasis, subject to higher and better offers.

**ANSWER:** Nexus admits that on August 14, 2023, Plaintiffs filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Nexus denies the remaining allegations of Paragraph 20 for lack of knowledge.

21.     Plaintiffs' chapter 11 cases are jointly administered and pending in the Court in the cases captioned *In re Nashville Senior Care, LLC, et al*., Case No. 23-02924 (MFH) (Jointly Administered) (the "Chapter 11 Cases").

**ANSWER:** Admitted.

22.     Plaintiffs are authorized to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**ANSWER:** Admitted.

23.     On September 19, 2023, the Bankruptcy Court entered an order setting a bid deadline and a date for auction, and establishing procedures governing the marketing, auction, and sale of the assets (the "Bidding Procedures Order") (ECF No. 198).

**ANSWER:** Admitted.

### Nexus Capital Submits the Winning Bid

24.     Prior to the auction, Plaintiffs received a preemptive, economically superior offer from Nexus Capital for the same assets being acquired by Cascasis. Nexus Capital offered to purchase the assets for $57,500,000.00 plus the assumption of certain liabilities – a more than 40% increase over Cascasis's offer set forth in the Stalking Horse APA.

**ANSWER:** Admitted.

25.     Nexus Capital's offer, however, was contingent upon Plaintiffs cancelling the auction process in the Chapter 11 Cases and immediately moving forward with the private sale of Plaintiffs' assets.

**ANSWER:** Admitted.

26.    As an additional incentive for Plaintiffs' agreement to cancel the auction process in favor of private sale, Nexus Capital agreed to deposit $7,250,000 in an escrow account upon execution of a purchase agreement, which would increase to $8,000,000 upon entry of an order approving the sale (the "Escrow Deposit").

**ANSWER:** Admitted.

27.    On October 23, 2023, Plaintiffs and Nexus Capital entered into the Nexus APA in which Nexus Capital agreed to purchase substantially all of Plaintiffs' assets.  A copy of the Nexus APA is attached hereto as **Exhibit A**.

**ANSWER:** Admitted.

28.    Plaintiffs and Nexus Capital also entered into an Escrow Deposit Agreement regarding the handling of the Escrow Deposit.  A true and correct copy of the Escrow Deposit Agreement is attached hereto as **Exhibit B**.

**ANSWER:** Admitted.

29.    On October 24, 2023, Plaintiffs, in accordance with Nexus Capital's requirement, cancelled the auction ("Notice of Auction Cancellation") (ECF No. 324).

**ANSWER:** Admitted.

30.    On November 6, 2023, Plaintiffs and Cascasis entered into an agreement in which Cascasis agreed to be the "Backup Bidder" as that term is defined in the Bid Procedures Order, and the parties executed that certain Second Amendment to Asset Purchase Agreement, dated November 6, 2023 (the "Second Amendment", and with the Stalking Horse APA, the "Backup Bidder Agreement"). (ECF No. 359).

**ANSWER:** Admitted.

31.     The Backup Bidder Agreement provides that Cascasis has authority to terminate the Back-Up Bidder Agreement if Plaintiffs do not accept the back-up bid within one hundred and twenty (120) days following the date of the Sale Order (*i.e.*, March 7, 2024). (ECF No. 359 at 2(G)).

**ANSWER:**  Nexus states that the Backup Bidder Agreement is a document which speaks for itself and to which no answer is required.

32.     On November 8, 2023, the Bankruptcy Court entered an order (i) authorizing the private sale of substantially all of Plaintiffs' assets to Nexus Capital free and clear of all liens, claims, encumbrances, and interests; (ii) authorizing Plaintiffs to assume and assign certain executory contracts and unexpired leases; and (iii) granting other related relief (the "Sale Order"). (ECF No. 366).

**ANSWER:**  Admitted.

33.     Upon entry of the Sale Order (and as required pursuant to Paragraph 51 of the Sale Order), Nexus Capital deposited the additional $750,000 into the escrow account.

**ANSWER:**  Admitted.

34.     The Sale Order also approved the Backup Bidder and provided, among other things, that Plaintiffs are entitled to "consummate the sale of the Purchased Assets to the Backup Bidder in accordance with the terms of the Backup Bidder Agreement" in the event Nexus Capital "cannot or refuses to consummate the Sale in accordance with the [Nexus APA]." (ECF No. 366 at ¶ 44).

**ANSWER:**  Admitted. Nexus states affirmatively that it can consummate and has not refused to consummate the Sale described in Paragraph 34 in accordance with the Nexus APA (also known herein as the "APA," as noted above). Rather, Plaintiffs have refused to consummate that Sale and have sabotaged Nexus' ability to close.

4866-2791-9781.1

## The Nexus APA

35.     The Nexus APA governs the agreement between Plaintiffs and Nexus Capital regarding the terms of the sale, including, without limitation, delineation of the assets purchased, liabilities assumed, and purchase price.  (*See* Ex.  A).

**ANSWER:**  Admitted.


36.     In particular, Nexus Capital agreed to pay Plaintiffs an aggregate sum of $57,500,000 (the "Purchase Price") for all real property, tangible property used in the operation of Plaintiffs' business (including the Facilities), intangible property rights related to each business location, commercial occupancy leases, assumed contracts, and National Provider Numbers and any other applicable provider numbers with any state or other issuer of governing body, amongst other things (the "Purchased Assets"). (Ex. A at 2.01, 2.05).

**ANSWER:**  Admitted that the cited terms are among the provisions of the APA.


37.     The parties agreed that payment of the Purchase Price would be made as follows:

(a)     A deposit in the amount of $7,250,000 (the "**Initial Escrow Deposit**") shall be delivered by Buyer to Escrow Agent on the Execution Date pursuant to the terms and conditions of the Escrow Deposit Agreement in the form of **Exhibit D** (the "**Escrow Deposit Agreement**").  Within one (1) business day after the entry of the Sale Order, a deposit in the amount of $750,000 (the "**Second Escrow Deposit**", and together with the Initial Escrow Deposit, collectively, the "**Escrow Deposit**") shall be delivered by Buyer to Escrow Agent pursuant to the Escrow Deposit Agreement.  Closing or termination of this Agreement, whether prior to or after the commencement of the Bankruptcy Case, the Escrow Deposit, together with accrued interest thereof, shall be delivered to Seller or Buyer in accordance with the terms herein that are applicable to the Escrow Deposit.

(b)     Payment of the remaining amount of the Purchase Price plus or minus prorations or adjustments herein set forth shall be paid by Buyer at the Closing by wire transfer to Escrow Agent (the "**Purchase Price Balance**").

Ex. A at 2.05 (emphasis in original).

**ANSWER:**  Admitted that the cited terms are among the provisions of the APA.

38.     The Nexus APA also contained certain representations, warranties, and covenants governing the parties' conduct between the execution and consummation of the Nexus APA.  (Ex. A at Arts. IV, V, VI).

**ANSWER:**  Admitted. Nexus states affirmatively that Plaintiffs have breached these obligations.

39.     For example, Plaintiffs agreed to permit Nexus Capital and its Representatives[3] to access, inspect, and appraise Plaintiffs' real property, properties, assets, premises, books and records, and contracts during regular business hours. (Ex. A at Section 6.02).

**ANSWER:**  Admitted. Nexus states affirmatively that Plaintiffs have breached these obligations.

40.     In addition, Nexus Capital was required to file certain regulatory notices and applications within ten (10) days of the entry of the Sale Order (*i.e.*, November 18, 2023):

> Additionally, Buyer shall, within ten (10) days after entry of the Sale Order, submit the necessary applications to the applicable regulatory authorities to obtain such Permits and Regulatory Approvals as are needed to consummate the sale (with copies of such applications promptly provided to Sellers) and shall diligently and expeditiously follow up on and pursue such Permits and Regulatory Approvals. Notwithstanding anything contained herein, upon written notice by Buyer to Sellers delivered prior to the then-scheduled Condition Satisfaction Date, Buyer may on a single instance, extend the Condition Satisfaction Date by a period not to exceed thirty (30) days if, despite using diligent and continuous efforts to obtain such Permits and Regulatory Approvals as are needed to consummate the sale, it reasonably appears that the Permits and Regulatory Approvals will not be issued prior to the then-scheduled Condition Satisfaction Date.
>
> Ex. A at Section 6.08.

---

[3] The Nexus APA defines "Representative" as all directors, officers, employees, consultants, financial advisors, counsel, accounts, and other agents.

4866-2791-9781.1

**ANSWER:** Denied. Nexus states affirmatively that its requirements were dependent upon Plaintiffs' upholding their obligations under the APA, including honoring their duty of good faith and fair dealing. Instead, Plaintiffs have breached these obligations and sabotaged Nexus' ability to file regulatory notices and applications, as anticipated by the APA, and to otherwise pursue the closing of the Sale anticipated by the APA.

41.     The parties' respective obligations to close the transaction pursuant to the Nexus APA were subject to the other party's fulfillment of the requisite covenants and obligations prior to the Closing Date. (Ex. A at Art. VII).

**ANSWER:** Admitted. Nexus states affirmatively that Plaintiffs have not fulfilled their requisite covenants and obligations under the APA.

42.     Plaintiffs' obligation to close the transaction was therefore subject to Nexus Capital's compliance with all conditions and covenants, including its timely filing for, and receipt of, all permits and regulatory approvals set forth in the Nexus APA. (Ex. A at Sections 7.01(c), 7.03(c)).

**ANSWER:** Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

43.     Section 8.01(c) of the Nexus APA granted Plaintiffs the right to terminate the APA if Nexus Capital failed to fulfill its obligations under Article VII of the Nexus APA, including obtaining the requisite regulatory approval, by the Condition Satisfaction Date (i.e. February 6, 2024).[4]

---

[4] The Condition Satisfaction Date is defined as ninety (90) days following the date on which the Sale Order is entered. (Ex. A at 8.01(b)(ii)). Because the Sale Order was entered on November 8, 2023, the Condition Satisfaction Date was February 6, 2024. Nexus Capital failed to obtain any extension of the Condition Satisfaction Date.

4866-2791-9781.1

**ANSWER:**  Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

44.     In the event of a termination pursuant to Section 8.01(c), Plaintiffs were entitled to retain the Escrow Deposit as liquidated damages:

> (c)    in the event of Sellers' termination pursuant to **Section 8.01(c)(i), 8.01(c)(ii), 8.01(c)(iii)** or **8.01(e)(iii)**(subject to such failure to meet a condition or such delay under **8.01(c)(ii), 8.01(c)(iii) or 8.01(e)(iii)** being a result of Buyer's breach), Sellers shall, following Seller's delivery of written notice of termination to Buyer and Escrow Agent and subject to the terms of the Escrow Deposit Agreement, retain the Escrow Deposit as liquidated damages and as Sellers' sole and exclusive remedy with respect to this Agreement and the transactions contemplated herein (Sellers and Buyer agree that Sellers' actual damages in the event of a failure to consummate this sale due to Buyer's default would be extremely difficult or impracticable to determine, and that the amount of the Escrow Deposit is a reasonable estimate of the damages that Sellers would incur in such event);that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

> Ex. A at Section 8.02(c) (emphasis in original).

**ANSWER:**  Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

## The Escrow Deposit Agreement

45.     In conjunction with the Nexus APA, Plaintiffs, Nexus Capital, and First American Title Insurance Company ("Escrow Agent") entered into the Escrow Deposit Agreement.  (Ex. B).

**ANSWER:**  Admitted.

46.     The Escrow Deposit Agreement governs the Escrow Agent's duties and handling of Nexus Capital's deposit of $8,000,000 (the "Escrow Deposit").  (Ex. B).

**ANSWER:**  Admitted.


47.     More specifically, the parties agreed that, in the event of termination by Plaintiffs based upon a breach by Nexus Capital, the Escrow Deposit would be handled as follows:

> (b)  In the event Buyer defaults with respect to its obligations under the APA, and such default gives rise to the rightful termination by Seller of the APA, as contemplated by Section 8.02(c) of the APA, Escrow Agent shall deliver the Escrow Deposit to Seller upon the receipt of a notice of termination of APA and written direction from Seller and to each of Escrow Agent and Buyer for such disbursement in accordance with Section 8.02(c) of the APA.  Buyer shall have three (3) business days to challenge the written direction and disbursement to Seller by delivering a written notice of challenge to Seller and Escrow Agent.  If such challenge is timely delivered, then Escrow Agent shall withhold such disbursement until either (i) both Seller and Buyer jointly issue written disbursement instructions to Escrow Agent, or (ii) Escrow Agent is provided a final order from a Court of Competent Jurisdiction providing direction on the disbursement instructions.

Ex. B at 2(a), (b).

**ANSWER:**   Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were

subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA.

Plaintiffs, however, have breached these obligations. Nexus has not breached the APA. Rather,

Plaintiffs have.


### Due Diligence Materials and Site Visits

48.     Prior to executing the Nexus APA, Plaintiffs gave Nexus Capital access to voluminous documents in the virtual data room and provided Nexus Capital with other various documents related to the operations and financial conditions of the business. (Ex. A at Section 5.06).

4866-2791-9781.1

**ANSWER:** Denied. Nexus states affirmatively that Plaintiffs withheld substantial and necessary documents required for closing.

49.     Thereafter, Plaintiffs continued to cooperate in providing information to Nexus Capital upon request, however Plaintiffs were "under no obligation to create documents or provide any related documents which are outside those in the possession of [Plaintiffs]." (Ex. A at Section 5.06).

**ANSWER:** Denied.

50.     Between November 20 and November 28, 2023, Plaintiffs continued to provide Nexus Capital with a wide variety of financial and operational diligence information, including approximately 176 pages of requested information through the online data site which included updated financial statements, payroll registers, example floor plans, and depreciation reports, and numerous email exchanges.

**ANSWER:** Admitted that between November 20 and November 28, 2023, Plaintiffs provided Nexus with approximately 176 pages of documents. Otherwise denied. Nexus states affirmatively that Plaintiffs have withheld documents which are essential for closing.

51.     Moreover, up to and through the date of termination of the Nexus APA, Plaintiffs continued to supplement Nexus Capital's ongoing document and data requests and, at all times, fully complied with their contractual obligations to provide the same.

**ANSWER:** Denied. Nexus states affirmatively that Plaintiffs have breached their contractual obligations as set forth in Paragraph 1 above and in Nexus' Counterclaim below.

52.     Plaintiffs also arranged numerous site tours for Nexus Capital and its alleged Representatives pursuant to section 6.02 of the Nexus APA.  (Ex. A at Section 6.02).

**ANSWER:** Nexus admits that Plaintiffs arranged a limited number of site tours but otherwise denies the allegations. Nexus states that its Representatives were each authorized agents of Nexus, within the terms of the APA. Nexus further states that the Plaintiffs delayed and refused to

cooperate in scheduling site tours and that these tours failed to permit Nexus to make essential determinations necessary to close, including the number of independent living units at each facility.

53.     For example, on November 27, 2023, at the request of Nexus Capital, Steven Friedman and Naomi Halpert, along with Ben Ilhardt from Houlihan Lokey, visited the McKendree Village property and had an opportunity to inspect the facility (the "November 27 Site Visit").

**ANSWER:**  Admitted, except that Nexus denies that it and its Representatives were given full access to the McKendree Village property, as is necessary to gather information essential for closing.

54.     Likewise, on November 28, 2023, at the request of Nexus Capital, Steven Friedman and Naomi Halpert along with Ben Ilhardt from Houlihan Lokey visited the Waynesboro Health and Rehab Center property and had an opportunity to inspect the facility (the "November 28 Site Visit"). In the course of the November 27 Site Visit and the November 28 Site Visit, Naomi Halpert indicated to Ben Ilhardt that her organization, Ness Healthcare, had been contacted by Nexus Capital about the opportunity to purchase the Sellers' Facilities in Tennessee.

**ANSWER:**  Nexus states that the word "indicated" in the last sentence of paragraph 54 makes that sentence vague and ambiguous and therefore denies that allegation. Nexus otherwise admits the allegations of paragraph 54, except that it denies that it and its Representatives were given full access to the Waynesboro Health and Rehab Center property, as is necessary to gather information essential for closing.

55.     Remarkably, and consistent with Ms. Halpert's statements on November 28, as requests for site visits continued to increase, it became apparent that Nexus Capital was requesting visits for individuals that, upon information and belief, were not Representatives (as defined in the Nexus APA), but rather, potential *subsequent purchasers* with whom Nexus Capital was engaged in preliminary marketing.

4866-2791-9781.1

**ANSWER:** Denied. Nexus states affirmatively that each person who visited sites on its behalf was its authorized representative, and within the meaning of "agent" in the APA.

56.     For example, on December 4, 2023, at the request of Nexus Capital, Josef Cukier and one of his colleagues, along with Jack Zylke from Houlihan Lokey, visited the Palms of Sebring property and had an opportunity to inspect the facility. Nexus Capital did not identify the organization these individuals were employed by, but during the visit Josef Cukier indicated to Jack Zylke that he represented Vivo Healthcare.

**ANSWER:** Admitted that on December 4, 2023, at the request of Nexus Capital, Josef Cukier and one of his colleagues, and Jack Zylke from Houlihan Lokey visited the Palms of Sebring property, but denied that Mr. Cukier and his colleague were given full access to that facility, as is necessary to gather information essential for closing. Nexus otherwise denies the allegations of paragraph 56.

57.     On December 6, 2023, at the request of Nexus Capital, Scott Bidwell, along with Andrew Turnbull of Houlihan Lokey, visited the Waynesboro Health and Rehab Center property and had an opportunity to inspect the facility (the "December 6 Site Visit"). Nexus Capital did not identify the organization that Scott Bidwell was employed by, but during the December 6 Site Visit Scott Bidwell indicated to Andrew Turnbull that he worked for National Healthcare Corporation and was evaluating a potential purchase of the facility.

**ANSWER:** Admitted that on December 6, 2023, at the request of Nexus Capital, Scott Bidwell and Andrew Turnbull of Houlihan Lokey visited the Waynesboro Health and Rehab Center property, but denied that Mr. Bidwell was given full access to that facility, as is necessary to gather information essential for closing. Nexus otherwise denies the allegations of paragraph 57.

58.     On December 21, 2023, at the request of Nexus Capital, Andrew Feig, along with Ben Ilhardt of Houlihan Lokey, visited the McKendree Village property and had an opportunity to inspect the facility (the "December 21 Site Visit"). While Nexus Capital only identified Andrew Feig, an employee of Cedar Healthcare, as an attendee in advance of the tour, Andrew Feig brought with him a local real estate broker and two separate groups of individuals, some of whom indicated to Ben Ilhardt during the tour that they were potential buyers of portions of the Facilities.

**ANSWER:** Admitted that on December 21, 2023, a the request of Nexus, Andrew Feig, along with Ben Ilhardt of Houlihan Lokey, visited the McKendree Village property, but denied that Mr. Feig was given full access to that facility, as is necessary to gather information essential for closing. Nexus also admits that Andrew Feig is employed by Cedar Healthcare, but states that he is a Representative and agent of Nexus. Nexus states that the remaining allegations of paragraph 58 are vague and ambiguous and therefore denies these allegations.

59. On January 9, 2024, at the request of Nexus Capital, Alex Malech and Dave Alexander, along with Andrew Turnbull of Houlihan Lokey, visited the Friendship Village property and had an opportunity to inspect the facility. Representatives of Nexus Capital originally indicated Alex Malech was associated with Volare Healthcare, but subsequently indicated after inquiry from the Sellers that he was employed by Boulevard Health. Alex Malech indicated he would be bringing along Dave Alexander, who was employed by MajesticCare.

**ANSWER:** Admitted that on January 9, 2024, at Nexus' request, Alex Malech and Dave Alexander, along with Andrew Turnbull of Houlihan Lokey, visited the Friendship Village property, but denied that Mr. Malech and Mr. Alexander were given full access to that facility, as is necessary to gather information essential for closing. Nexus states that the remaining allegations of paragraph 59 are vague and ambiguous and therefore denies these allegations

60. The requests for non-Representative visits continued through the month, and, as late as February 6, 2024, at the request of Nexus Capital, Sellers facilitated a tour of the McKendree Village property. Nexus Capital's initial requested attendee list for this visit was seven individuals from five different organizations, who were described by Nexus Capital as a "funding partner/source." Two additional individuals, one of which (Adam Klenk of Capstone Companies) was a local real estate broker, were subsequently requested by Nexus Capital to join the tour as an alleged joint venture partner. However, on the day of the tour, approximately twenty individuals were brought to tour the property. Ben Ilhardt of Houlihan Lokey was on-site for this visit, but was not provided with a listing of all names or employing organizations.

**ANSWER:** Nexus specifically denies that any of those who visited properties at its request were "non-Representatives." Nexus admits that on or about February 6, 2024, Nexus requested a tour

4866-2791-9781.1

of the McKendree Village Property and that Plaintiffs arranged for a visit, but denied that Nexus'

Representatives were given full access to that facility, as is necessary to gather information

essential for closing. Nexus admits that Adam Klenk went on this visit as did others, and states

affirmatively that all were authorized Representatives of Nexus. Nexus otherwise denies the

allegations of paragraph 60.


## Nexus Capital Repeatedly Breaches the Nexus APA

61.    Above and beyond abusing the site tour diligence provision to run an alternative marketing process, almost immediately after the entry of the Sale Order, Nexus Capital breached the Nexus APA, setting the tone for the following ninety days of repeated and ongoing breaches.

**ANSWER:**    Denied. Nexus states affirmatively that it fully performed its obligations under the

APA, while Plaintiffs intentionally breached theirs, as set forth in its Answer to Paragraph 1 and

its Counterclaim below.


62.    Nexus Capital was required to submit necessary applications by November 18, 2023 to regulatory authorities to obtain permits and regulatory approvals necessary to close the sale.  (Ex. A at Section 6.08).

**ANSWER:**    Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were

subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA.

Plaintiffs, however, have breached these obligations


63.    Nexus Capital failed to submit the requisite applications in clear breach of the Nexus APA.

**ANSWER:** Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

64. Accordingly, on November 20, 2023, counsel for Plaintiffs notified Nexus Capital, via its counsel, that it was in breach of Section 6.08 of the Nexus APA. A copy of the November 20, 2023 correspondence is attached hereto as **Exhibit C**.

**ANSWER:** Nexus admits that on November 20, 2023, Plaintiffs' counsel sent Nexus Exhibit C. Nexus otherwise denies the allegations of Paragraph 64. Nexus states affirmatively that the allegations of this Exhibit C are entirely false, and that it was Plaintiffs that were and are in breach of their obligations under the APA, while Nexus has fully performed its obligations and is not in breach. Nexus also states affirmatively that Plaintiffs' Complaint omits substantial correspondence and communications which show that Plaintiffs are the breaching party.

65. Nexus Capital was required to cure its breach by November 30, 2023. (Ex. A at Section 8.01(c)(i)).

**ANSWER:** Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

66. On November 29, 2023, Plaintiffs agreed to delay declaring Nexus Capital in default of the Nexus APA if Nexus Capital filed certain licenses and provided proof of those filings by December 4, 2023.

**ANSWER:** Denied. Nexus states affirmatively that it was not in default of the APA at any time. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs'

fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

67.     Nexus Capital failed to provide the requisite proof on or before December 4, 2023.

**ANSWER:**  Denied. Nexus states affirmatively that it was not in default of the APA at any time. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. No proof was "requisite."

68.     On January 3, 2024, Plaintiffs again notified Nexus Capital that it remained in breach of its obligations to timely file all regulatory notices.  A copy of the January 3, 2024 correspondence is attached hereto as **Exhibit D**.

**ANSWER:**  Nexus admits that on January 3, 2024, Plaintiffs' counsel sent Nexus Exhibit D. Nexus otherwise denies the allegations of Paragraph 68. Nexus states affirmatively that the allegations of Exhibit D are entirely false and that it was Plaintiffs that were and are in breach of their obligations under the APA, while Nexus has fully performed its obligations and is not in breach. Nexus also states affirmatively that Plaintiffs' Complaint omits substantial correspondence and communications which show that Plaintiffs are the breaching party.

69.     In this same correspondence, Plaintiffs informed Nexus Capital of its discovery that Nexus Capital misrepresented the nature of the touring parties during the December 6 and December 21 Site Visits described above.  *Id.*

**ANSWER:**  Denied. Nexus states affirmatively that the allegations of Exhibit D are entirely false and that it was Plaintiffs that were and are in breach of their obligations under the APA, while Nexus has fully performed its obligations and is not in breach. Nexus also states affirmatively that

22

Plaintiffs' Complaint omits substantial correspondence and communications which show that Plaintiffs are the breaching party.

70.     On January 16, 2024, Plaintiffs sent yet another notice to Nexus Capital that it remained in continuous breach of the Nexus APA by its untimely regulatory filings and outright failure to submit the requisite regulatory filings for the Florida home health business, which was part of the assets being purchased in the Nexus APA. A copy of the January 16, 2024 correspondence is attached hereto as **Exhibit E**.

**ANSWER:**     Nexus admits that on January 16, 2024, Plaintiffs' counsel sent Nexus Exhibit E. Nexus otherwise denies the allegations of Paragraph 70. Nexus states affirmatively that the allegations of Exhibit E are entirely false and that it was Plaintiffs that were and are in breach of their obligations under the APA, while Nexus has fully performed its obligations and is not in breach. Nexus also states affirmatively that Plaintiffs' Complaint omits substantial correspondence and communications which show that Plaintiffs are the breaching party.

71.     Despite uncertainty about Nexus Capital's ability to uphold its obligations under the Nexus APA, Plaintiffs still attempted to work toward closing.  Plaintiffs offered to postpone termination of the Nexus APA if Nexus Capital executed an amendment providing for (a) bifurcated closing of the Florida home health business and all other assets, (b) a requirement to close on the non-home health assets by March 1, 2024 or release the $8 million deposit to Sellers, and (c) the option for Nexus Capital to purchase the Florida home health business through May 2, 2024. *Id.*

**ANSWER:**     Denied. Nexus states affirmatively that there was no uncertainty about its ability to uphold its obligations under the APA and Plaintiffs had no right to threaten termination or to terminate. Rather, as Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. While Nexus stood firm and ready to move

toward closing, Plaintiffs sabotaged this, including by engaging in the conduct described in the answer to Paragraph 1 above and in Nexus' Counterclaim.

72.     Rather than accepting Plaintiffs' proposal, on January 24, 2024, Nexus Capital spuriously accused Plaintiffs of delaying Nexus Capital's regulatory filings by refusing to cooperate and by failing to provide outstanding information necessary for the submissions. A copy of Nexus Capital's January 24, 2024 correspondence is attached hereto as **Exhibit F**.

**ANSWER:**     Nexus denies that Plaintiffs made a good faith proposal. Nexus admits it sent the January 24, 2024 correspondence attached to the Complaint as Exhibit F. Nexus states affirmatively that all statements in Exhibit F are true and accurate. Nexus states affirmatively that Plaintiffs did refuse to cooperate, including by insisting on closing "as is" while McKendree Village remains on CMS' termination track and may not be able to provide services if this is not corrected by April 4, 2024. Plaintiffs further refused to cooperate by failing to provide the HVAC Reports required by the Ohio Department of Health, which reports are necessary for Nexus to receive CHOW approval for the two Ohio facilities. This caused Nexus' CHOW application to be denied as "incomplete." Plaintiffs further failed to provide information on the number of independent living units in each facility or to enable Nexus to determine this through site visits. Plaintiffs further failed to provide each of the necessary pieces of information set forth in Exhibit F to the Complaint, Nexus' counsel's letter of January 24, 2024.

73.     That evening, counsel for Nexus Capital and Plaintiffs conferred via Zoom. Counsel for Plaintiffs rejected the accusations and asked Nexus Capital to commit to an actual, reliable closing date in an effort to protect Plaintiffs from a situation where the back-up bid expires before the close of the transaction.

**ANSWER:**     Nexus admits that the parties conferred by Zoom on the evening of January 24, 2024. Nexus otherwise denies the allegations of Paragraph 73. Nexus states affirmatively that it offered a reliable closing date to Plaintiffs, but Plaintiffs rejected this. Rather, Plaintiffs insisted on a

closing by March 1, 2024, despite the ongoing risk of termination by CMS of McKendree Village, and other breaches of their performance. Plaintiffs insisted that Nexus take McKendree Village "as is" and would not offer any protection or accommodation to Nexus, including making its clearance by CMS a condition precedent to closing, adjusting the purchase price or providing for an escrow. Instead, Plaintiffs offered that, among other sweetheart terms, to Cascasis in an alternative sale offer it surreptitiously pursued when it was supposed to be working toward closing with Nexus, in violation of its duty of good faith and fair dealing and otherwise in breach of the APA.

74.     Counsel for Nexus Capital responded by claiming that outstanding requests for information prevented Nexus Capital from committing to an outside date.

**ANSWER:**     Denied. Nexus states affirmatively that it offered closing dates based on the assumption that Plaintiffs' breaches as to McKendree Village and other breaches were resolved. Plaintiffs would not agree to this.

75.     In reality, however, none of the outstanding information identified in the correspondence impacted Nexus Capital's ability to close the transaction or submit its regulatory filings.  Rather, the outstanding requests for information were follow-up requests from regulatory authorities regarding applications *already filed* and/or 60-day or other notice periods for which the clock had already started.  Since the execution of the Nexus APA, Plaintiffs have fully complied with all information and diligence requests.

**ANSWER:**  Denied.

76.     On January 26, 2024, Plaintiffs provided all outstanding information requested by Nexus Capital, yet Nexus Capital did not agree to a closing date.

**ANSWER:**  Denied.

77.     On January 28, 2024, counsel for Plaintiffs requested Nexus Capital's prompt commitment to a firm closing date and acknowledgment that failure to close by that date would

result in forfeiture of the Escrow Deposit to Plaintiffs. A copy of the January 28, 2024 correspondence is attached hereto as **Exhibit G**.

**ANSWER:** Nexus admits that counsel for Plaintiffs sent Nexus the letter dated January 28, 2024, attached to the Complaint as Exhibit G, and that in that letter Plaintiffs threatened to seize Nexus' $8 Million deposit. Nexus states affirmatively that Exhibit G represented a further breach by Plaintiffs of their APA obligations, including their duty of good faith and fair dealing. Nexus also states affirmatively that Plaintiffs' attempt to seize the Deposit is an act of conversion and appears designed to shore up Cascasis' inferior offer. As evidence, of this, Cascasis offered to increase its purchase price if Plaintiffs have to return the Deposit to Nexus. As to the March 1, 2024 closing date that Plaintiffs insisted upon, see Nexus' answers to Paragraphs 1, 41, 73 and 74 above.

78.     Even as late as February 6, 2024, Plaintiffs scheduled a site visit at the McKendree facility.  Nexus Capital brought approximately twenty individuals to that site visit - so many that neither Plaintiffs nor Houlihan Lokey could determine who was an actual Representative of Nexus Capital, a potential purchaser, or a potential operator.  Even at this late date in the process (nearly 90 days after the Sale Order was entered), it was clear that Nexus Capital was nowhere near being in a position to be able to close the sale timely under the terms of the Nexus APA, which was further evidenced by Nexus Capital not even seeking to extend the Condition Satisfaction Date.

**ANSWER:** Nexus admits that Plaintiffs scheduled a site visit as of February 6, 2024, but states that it was never given full access to McKendree Village, as is necessary to gather information essential for closing. Nexus otherwise denies the allegations of Paragraph 78. *See also* Nexus' Answers to Paragraphs 1, 41, 73 and 74 above.

79.     Nexus Capital never committed to a closing date.

4866-2791-9781.1

**ANSWER:** Denied. Nexus states affirmatively that it offered a closing date that Plaintiffs refused and that it also offered to close by March 1, 2024 on all properties except McKendree Village, but would close on McKendree Village subject to it being fully cleared by CMS.

80.     On February 6, 2024, the Condition Satisfaction Date lapsed with Nexus Capital in continued breach of its obligations and covenants set forth in the Nexus APA and without Nexus Capital seeking to extend such date.

**ANSWER:** Denied.

81.     Consequently, on February 7, 2024, Plaintiffs exercised their rights to terminate the Nexus APA based on Nexus Capital's failure to satisfy its obligations and its repeated breaches of the Nexus APA. A copy of the Termination Notice is attached hereto as **Exhibit H**.

**ANSWER:** Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. While Nexus stood firm and ready to move toward closing, Plaintiffs sabotaged this, including by engaging in the conduct described in the answer to Paragraphs 1, 73 and 74 above and in Nexus' Counterclaim.

82.     More specifically, Plaintiffs terminated the Nexus APA pursuant to section 8.01(c)(ii) for Nexus Capital's failure to fulfill the conditions set forth in Section 7.01 – receipt of all permits and regulatory approvals set forth on Schedule 4.11(a) – by the Condition Satisfaction Date. (Ex. H).

**ANSWER:** Nexus admits that Plaintiffs purported to terminate the APA, but denies that Plaintiffs had ANY legal right to do so. Nexus otherwise denies the allegations of Paragraph 82. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. Nexus specifically states affirmatively that Plaintiffs' attempt to terminate was a

4866-2791-9781.1

flagrant breach of their APA obligations and a disregard of the Sale Order. (Dkt. 366). Nexus states

affirmatively that it fully performed its obligations under the APA.

83.     Plaintiffs also terminated the Nexus APA pursuant to section 8.01(c)(i) for Nexus Capital's multiple breaches of the Nexus APA and failures to perform certain representations, warranties, covenants and agreements. (Ex. H).

**ANSWER:**   Nexus admits that Plaintiffs purported to terminate the APA, but denies that Plaintiffs

had ANY legal right to do so. Nexus otherwise denies the allegations of Paragraph 83.  As Plaintiffs

admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of

their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these

obligations. Nexus specifically states affirmatively that Plaintiffs' attempt to terminate was a

flagrant breach of their APA obligations and a disregard of the Court's Order dated November 8,

2023. (Dkt. 366). Nexus states affirmatively that it fully performed its obligations under the APA.

84.     In addition, Plaintiffs terminated the Nexus APA pursuant to section 8.01(c)(iii) because certain conditions in section 7.03 were not fulfilled by the Condition Satisfaction Date, including without limitation the requirements and obligations under sections 7.03(b) and 7.03(c), such as failure to timely file for the Permits and Regulatory Approvals by the deadline set forth in the Nexus APA and other events that Nexus Capital failed and/or was otherwise unable to cure despite having received written notice of such breaches more than ten days prior. (Ex. H).

**ANSWER:**   Nexus admits that Plaintiffs purported to terminate the APA, but denies that Plaintiffs

had ANY legal right to do so. Nexus otherwise denies the allegations of Paragraph 84.  As Plaintiffs

admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of

their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these

obligations. Nexus specifically states affirmatively that Plaintiffs' attempt to terminate was a

flagrant breach of their APA obligations and a disregard of the Sale Order. (Dkt. 366). Nexus states affirmatively that it fully performed its obligations under the APA.

85.     Pursuant to section 8.02(c) of the Nexus APA, Plaintiffs, after delivery of written notice of termination to Nexus Capital and the Escrow Agent, are authorized to retain the full amount of the Escrow Deposit as liquidated damages for the termination. (Ex. H at 8.02(c)).

**ANSWER:**   Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. Nexus specifically states affirmatively that Plaintiffs' attempt to terminate was a flagrant breach of their APA obligations and a disregard of the Sale Order. (Dkt. 366). Nexus states affirmatively that it fully performed its obligations under the APA.

86.     Plaintiffs provided written notice, in compliance with section 8.02(c) of the Nexus APA, to the Escrow Agent via email on February 7, 2024.  A copy of the Notice to Escrow Agent is attached hereto as **Exhibit I**.

**ANSWER:**   Nexus admits that Plaintiffs provided the written letter to the Escrow Agent attached to the Complaint as Exhibit I but denies that it had any legal right to do so and otherwise denies the allegations of Paragraph 86. Rather, Exhibit I is a further breach of Plaintiffs' obligations under the APA and violates the Sale Order (Dkt. 366). Nexus also states affirmatively that Plaintiffs' attempt to seize the Deposit is an act of conversion and appears, is, and was designed to shore up Cascasis' inferior offer. As evidence of this, Cascasis offered to increase its purchase price if Plaintiffs have to return the Deposit to Nexus. As to the March 1, 2024 closing date that Plaintiffs insisted upon, see Nexus' answers to Paragraphs 1, 41, 73 and 74 above.

87.     On February 7, 2024, Nexus Capital contested Plaintiffs' retention of the Escrow Deposit with the Escrow Agent, see **Exhibit J**.

4866-2791-9781.1

**ANSWER:**   Admitted.

88.     By the terms of the Escrow Agreement, the Escrow Deposit is being held by the Escrow Agent pending further order of the Court.

**ANSWER:**   Nexus admits that the Escrow Deposit is being held by the Escrow Agent. Nexus states affirmatively that Plaintiffs are improperly trying to convert that Deposit by trying to seize it without right and by filing this vexatious, frivolous and false complaint. Nexus also states affirmatively that Plaintiffs' attempt to seize the Deposit is an act of conversion and appears, is, and was designed to shore up Cascasis' inferior offer. As evidence of this, Cascasis offered to increase its purchase price if Plaintiffs have to return the Deposit to Nexus. As to the March 1, 2024 closing date that Plaintiffs insisted upon, see Nexus' answers to Paragraphs 1, 41, 73 and 74 and 87 above.

**COUNT I**
**Declaration of Rights to Escrow Deposit**

89.     Plaintiffs reincorporate and re-allege the allegations set forth in paragraphs 1 through 88 as if set forth fully herein.

**ANSWER:**   Nexus reincorporates and re-alleges the allegations set forth in its answers to paragraphs 1 through 88 as if set forth fully herein.

90.     Section 8.02 of the Nexus APA provides that, upon Plaintiffs' termination pursuant to sections 8.01(c)(i), (ii), or (iii) and written notice to Nexus Capital and the Escrow Agent in light of Nexus Capital's breaches, Plaintiffs shall retain the Escrow Deposit as liquidated damages. (Ex. A at Section 8.02(c)).

**ANSWER:**   Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations. Nexus specifically states affirmatively that Plaintiffs' attempt to terminate was a flagrant breach of their APA obligations and a disregard of

30

the Sale Order. (Dkt. 366). Nexus states affirmatively that it fully performed its obligations under the APA. Nexus further states affirmatively that Plaintiffs' attempt to seize the Deposit is an attempted act of conversion and appears, is, and was designed to shore up Cascasis' inferior offer. As evidence, of this, Cascasis offered to increase its purchase price if Plaintiffs have to return the Deposit to Nexus. As to the March 1, 2024 closing date that Plaintiffs insisted upon, see Nexus' answers to Paragraphs 1, 41, 73 and 74, 87 and 88 above.

91.     Plaintiffs terminated the Nexus APA pursuant to Sections 8.01(c)(ii), as well as sections (i) and (iii) and provided written notice to Nexus Capital and the Escrow Agent. (Ex. H and I).

**ANSWER:**   Denied. As Plaintiffs admit in Paragraph 41, Nexus' obligations under the APA were subject to Plaintiffs' fulfillment of their requisite covenants and obligations under the APA. Plaintiffs, however, have breached these obligations.

92.     Nexus Capital disputes that Plaintiffs are entitled to retain the Escrow Deposit.  (Ex. J).

**ANSWER:**  Admitted.

93.     Accordingly, there is a bone fide dispute and actual controversy between the parties as to their respective interest in and rights to the Escrow Deposit.

**ANSWER:**  Denied.

94.     The Declaratory Judgment Act provides in relevant part:

> In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

sought. Any such declaration shall have the force and effect of a
final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

**ANSWER:** Admitted that the Declaratory Judgment Act is set forth in 28 U.S.C. § 2201(a), which

speaks for itself. Otherwise denied. Nexus states affirmatively that Plaintiffs are in clear breach of

the APA and the Sale Order, (Dkt. 366), and that Plaintiffs raise no bona fide dispute and have no

legitimate basis for bringing this Complaint, which is instead frivolous and vexatious.

95.     Plaintiffs now seek, pursuant to 28 U.S.C. § 2201(a), a declaration by the Court
that, as a result of Nexus Capital's breach of the Nexus APA, and Plaintiffs' proper termination
notice to Nexus Capital and proper notice to the Escrow Agent thereof, Plaintiffs are entitled to the
immediate receipt of the Escrow Deposit.

**ANSWER:** Nexus denies that Plaintiffs have any basis for relief and states affirmatively that

each of its stated bases is absolutely false.

## **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**

#### (Failure to State A Claim)

Plaintiffs' complaint, in whole or in part, fails to state a claim for which relief can be

granted.

### **Second Affirmative Defense**

#### (Unclean Hands)

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### **Third Affirmative Defense**

#### (Waiver)

Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

32

## Fourth Affirmative Defense

### (Failure To Satisfy Conditions Precedent)

Plaintiffs' claims are barred in whole or in part by their failure to satisfy conditions precedent.

## Fifth Affirmative Defense

### (Estoppel)

Plaintiffs' claims for damages and other relief are barred, in whole or in part, by the doctrine of estoppel.

## Sixth Affirmative Defense

### (Standing)

Plaintiff lacks standing to seek declaratory relief.

## Seventh Affirmative Defense

### (Lack Of Causation)

Plaintiffs' claims are barred, in whole or in part, because the alleged harm, if any was caused by their own breaches, acts or omissions.

## Eighth Affirmative Defense

### (Failure to Mitigate Damages)

Plaintiffs' claims are barred, in whole or in part, by their failure to mitigate its damages.

Nexus expressly reserves the right to assert such other affirmative defenses as become known through the course of this litigation, including the course of discovery.

33

## NEXUS' VERIFIED COUNTERCLAIM FOR SPECIFIC PERFORMANCE, OTHER INJUNCTIVE RELIEF, INCLUDING A PRELMINARY INJUNCTION, AND DAMAGES

Nexus, for its counterclaim for specific performance, other injunctive relief, including a preliminary injunction, and damages, against Plaintiffs-Counterdefendants Nashville Senior Care LLC, Cincinnati Senior Care, LLC, Dayton Senior Care, LLC, Florida Senior Living, LLC, Sebring Senior Living, Inc., Trousdale Issuer, LLC, and Waynesboro Healthcare, LLC, each of which is a debtor in these chapter 11 cases (collectively, "Defendants" or "Plaintiffs-Counterdefendants"), states the following:

## NATURE OF COUNTERCLAIM

1. On November 8, 2023, this Court entered the Sale Order (Dkt. 366), which granted Plaintiffs-Counterdefendants' motion to authorize the private sale of substantially all of the Plaintiffs-Counterdefendants' assets free and clear of all liens and encumbrances to Nexus for $57.5 million, plus additional consideration, pursuant to an Asset Purchase Agreement between Nexus and Plaintiffs-Counterdefendants dated October 23, 2023 (the "APA").[5] (Dkt. 321). The assets at issue include five senior living facilities and one home health company in three different states (collectively, the "Assets"). Nexus' offer was more than a 40% increase over the bid of $41 million (the "Stalking Horse Bid") made by Cascasis, LLC. As Plaintiffs-Counterdefendants then accurately represented and the Court found, the private sale to Nexus was in the best interests of Plaintiffs-Counterdefendants and their estates. In good faith and with the rightful understanding and expectation that Plaintiffs-Counterdefendants would also act in good faith, Nexus deposited

---

[5] The APA is attached hereto as Ex. 1. It was also attached as Exhibit A to Plaintiffs-Counterdefendants' *Expedited Motion For Entry Of An Order I) Authorizing The Private Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; II) Authorizing The Debtors To Assume And Assign Certain Executory Contracts And Unexpired Leases; And III) Granting Other Related Relief*, Dkt. 321 (the "Motion" or "Mot.").

$8 million with the Plaintiffs-Counterdefendants' estates (the "Deposit"). The Deposit amount was approximately 14% of Nexus' purchase price, while the Stalking Horse Bid only required 5%, and that on a lesser purchase price amount.

2.     Since the APA's execution, Nexus has diligently worked to close on its purchase. Plaintiffs-Counterdefendants, however, have intentionally sabotaged the ability to close. The APA specifically required Plaintiffs-Counterdefendants to use commercially reasonable efforts to facilitate the timely closing of the transaction and specified other required cooperation. This included providing necessary records and documentation, permitting site inspections of the facilities, and ensuring that each facility purchased was in fact authorized by regulators to provide the healthcare services to seniors anticipated and that they were otherwise in compliance with regulatory obligations. The APA also specifically obligated Plaintiffs-Counterdefendants to act consistent with their duty of good faith and fair dealing. Plaintiffs-Counterdefendants, however, have made a mockery of these obligations and intentionally and egregiously frustrated Nexus' ability to close.

3.     One of the six facilities—McKendree Village in Hermitage, Tennessee—is in danger of being terminated as a licensed provider by the Center for Medicare and Medicaid Services ("CMS"), having failed two re-surveys, and must complete a Plan of Correction in order to avoid termination by April 2024. Plaintiffs-Counterdefendants have also failed to provide the HVAC report from an HVAC professional confirming that the heating and cooling systems at its two Ohio facilities are in good working order (the "HVAC Report"). This HVAC Report is necessary for the Ohio Department of Health to approve the Change of Ownership ("CHOW") application to Nexus for the two facilities there. In fact, Nexus' CHOW application was denied as incomplete on February 9, 2024 because, in part, the HVAC Report was missing. Plaintiffs-

35

Counterdefendants have otherwise refused to facilitate necessary site inspections and failed to provide essential records.

4. Despite Plaintiffs-Counterdefendants' non-compliance, Nexus has continued to take all steps possible to advance the deal toward closing, including pursuing CHOW approvals, and remains fully committed to closing. Despite Plaintiffs-Counterdefendants' failures, Nexus has never sought a reduction in its purchase price or disavowed any of its promises under the APA.

5. On February 7, 2024, however, Plaintiffs-Counterdefendants abruptly, without cause, and in egregious violation of the Sale Order and in breach of the APA, terminated the APA. (*See* Dkt. 516). Plaintiffs-Counterdefendants brazenly faulted Nexus for not closing when they caused conditions precedent to closing—including the viability of the McKendree Village license and the completion of HVAC Reports necessary for CHOW approvals in Ohio—to remain unsatisfied.

6. In a further egregious breach, Plaintiffs-Counterdefendants have attempted to confiscate Nexus' good faith $8 million deposit. This is a willful and wanton act of conversion.

7. In fact, the Plaintiffs-Counterdefendants' termination was a total pretext for Plaintiffs-Counterdefendants to surreptitiously pursue an improper alternative sale of these Assets to Cascasis, LLC, the back up bidder ("Cascasis," the "Stalking Horse Bidder" or the "Back Up Bidder"). Plaintiffs-Counterdefendants were negotiating this alternative sale at the same time as they were stonewalling the production of records to Nexus, refusing site visits to Nexus and its Representatives, leaving the HVAC Report in Ohio in limbo, and leaving McKendree Village to fester.

4866-2791-9781.1

8.      Plaintiffs-Counterdefendants compounded their act of bad faith in pursuing this alternative deal by offering the Back Up Bidder sweetheart terms. Thus, while Plaintiffs-Counterdefendants insisted that Nexus close–even while the McKendree Village license hangs in jeopardy–their alternative deal with the Back Up Bidder makes rectifying that problem a condition precedent to closing.

9.      The APA expressly confers upon Nexus the right to specific performance of the APA under these circumstances, noting that if, as has happened, the counterparty fails to perform any provision of the APA in accordance with its terms, Nexus will suffer irreparable damage, as it has. Therefore, Nexus has an unequivocal right to specific performance. Specific performance is independently justified because of the unique nature of the real properties Nexus has purchased.

10.     Nexus is also entitled to preliminary and permanent injunctive relief preventing Plaintiffs-Counterdefendants from converting Nexus' Deposit and from proceeding further with an alternative sale of the Assets to the Back Up Bidder or any alternative purchaser.

11.     Plaintiff is also entitled to damages for Plaintiffs-Counterdefendants' flagrant breach of the APA.

**PARTIES**

12.     Plaintiff Nexus Capital, LLC is an LLC formed under the laws of Delaware. Its principal place of business is Lakewood, New Jersey.

13.     Plaintiffs-Counterdefendants are debtors in chapter 11 cases all consolidated before the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division. Debtors are Nashville Senior Care, LLC, Cincinnati Senior Care, LLC, Dayton Senior Care, LLC,

37

Florida Senior Living, LLC, Sebring Senior Living, Inc., Trousdale Issuer, LLC and Waynesboro Healthcare, LLC. The corporate headquarters and the mailing address for the Plaintiffs-Counterdefendants is 485 Central Avenue NE, Cleveland, Tennessee 37311.

14.     Each of the Plaintiffs-Counterdefendants is engaged in the business of the ownership and operation of residential senior care facilities and the provision of related healthcare services and ancillary business services. Plaintiffs-Counterdefendants operate five senior living facilities and one home health company in three different states under the following trade names: i) The Palms of Sebring, located in Sebring, Florida; ii) Hyde Park Health Center,[6] located in Cincinnati, Ohio; iii) Friendship Village, located in Dayton, Ohio; iv) McKendree Village, located in Hermitage, Tennessee; v) Waynesboro Health and Rehab, located in Waynesboro, Tennessee; and vi) Palms Home Care, also located in Sebring, Florida. Each is among the Assets purchased by Nexus in the APA.[7]

15.     Across all these facilities, Plaintiffs-Counterdefendants have 574 independent living units; 338 assisted living unit; 84 memory care units; 684 skilled nursing beds and a home health agency licensed to serve residents of Highlands and Polk Counties in Florida.[8]

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter under 28 U.S.C §§ 157, 1331 and 1334, as this matter arises in and/or is related to the Debtors' chapter 11 case before this

---

[6] Hyde Park Health Center is also known as "Gardens of Oakley".

[7] *See Declaration of Thomas Johnson in support of Chapter 11 Petitions and First Day Pleadings*, Dkt. 24 ¶1 ("Johnson Decl.").

[8] *See id.* at ¶12.

Court. Plaintiffs-Counterdefendants are debtors in chapter 11 and Nexus is pursuing its rights under an APA that this Court, by Order, specifically approved. (*See* Dkt. 366).

17.     This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

18.     The Court may determine interests in property pursuant to 11 U.S.C. § 105(a), and such relief is properly sought in an adversary proceeding pursuant to Rules 7001(1)–(2), (7) of the Federal Rules of Bankruptcy Procedure.

19.     Venue is proper under 28 U.S.C. § 1409, in that this is a proceeding arising in and/or related to Plaintiffs-Counterdefendants' chapter 11 case pending in this District.

## FACTS COMMON TO ALL COUNTS

20.     On August 14, 2023 (the "Petition Date"), the Plaintiffs-Counterdefendants filed with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Their cases are being jointly administered with those of certain of their affiliates.

21.     Plaintiffs-Counterdefendants have been authorized to operate their businesses and manage their property as debtors in possession pursuant to 11 U.S.C. §§ 1107, 1108.

A.      **Plaintiffs-Counterdefendants Robustly Market The Assets For More Than A Year Before Nexus Presents An Unrivaled, Superior Offer**

22.     Beginning more than a year before the Motion, in July 2022, the Debtors retained an investment banker, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), to assist with strategic alternatives, including options to improve the Debtors' liquidity and financial position, including raising additional capital and restructuring their funded debt and other liabilities. (*See* Mot., Dkt. 321, ¶18).

4866-2791-9781.1

23.     Beginning in September 2022, Houlihan Lokey began a prepetition marketing process with potential strategic and financial buyers to solicit interest in the companies. Houlihan Lokey contacted more than 200 potential acquirers, and 51 signed NDAs. (*See* Mot., Dkt. 321, ¶19). Houlihan Lokey marketed substantially all of the Plaintiffs-Counterdefendants' assets. (*See id.* at ¶ 11).

24.     Through those efforts, Plaintiffs-Counterdefendants identified a Stalking Horse Bidder–Cascasis, LLC. (*See* Mot., Dkt. 321, ¶11).

25.     On August 4, 2023, Plaintiffs-Counterdefendants received Board authorization to enter into an asset purchase agreement of that date between Plaintiffs-Counterdefendants and the Stalking Horse Bidder. (*See* Mot., Dkt. 321, ¶19).

26.     After the Petition Date, Houlihan Lokey contacted 217 purchasers, with 11 new parties signing NDAs. (*See* Mot., Dkt. 321, ¶20).

27.     Plaintiffs-Counterdefendants' marketing efforts were subject to a Bidding Procedures Order entered by the Court. (*See* Mot., Dkt. 321, ¶11).

28.     Houlihan Lokey's efforts included extensive business discussions, telephone calls, facility tours, and in-person meetings between and among Houlihan Lokey, certain of Defendant-Debtor's personnel and various prospective purchasers. (*See* Mot., Dkt. 321, ¶12).

29.     Plaintiffs-Counterdefendants represented to the Court that Houlihan Lokey pursued robust marketing efforts to find the appropriate purchaser of the assets. (*See* Mot., Dkt. 321, ¶11).

4866-2791-9781.1

30.     During the post-petition marketing process, Nexus informed Plaintiffs-Counterdefendants of its interest in the Assets. (*See* Mot., Dkt. 321, ¶12).

31.     After further negotiations, Nexus offered to purchase the Assets for $57.5 million plus Assumed Liabilities (which include the Cure Amounts for any of the Assumed Contracts). (*See id*.).

32.     Nexus' offer provided Plaintiffs-Counterdefendants, and therefore, their estates, with more than 40% additional economic value than the Stalking Horse Bid. Plaintiffs-Counterdefendants recognized that Nexus' offer was at or above the Plaintiffs-Counterdefendants' expectations of the value that would have been expected to be received by the Plaintiffs-Counterdefendants had they have conducted an auction. (*See id.*).

33.     While Plaintiffs-Counterdefendants had planned to conduct an overbid process and an auction, Nexus' offer was contingent upon Plaintiffs-Counterdefendants cancelling each of those. (*See id.*).

34.     Further, Nexus agreed to provide a deposit of $8 million upon entry of the Sale Order. (*See id.)*. This was approximately 14% of the cash portion of the purchase price. (*See id.* at ¶12). In comparison, the Stalking Horse Bidder was required to only put up an approximate 5% deposit of a substantially lower economic offer than Nexus'. (*Id*. at ¶15).

35.     Because of the vast superiority of Nexus' offer, Plaintiffs-Counterdefendants executed the APA with Nexus. Plaintiffs-Counterdefendants then cancelled the auction and forwent the auction and related overbid process established by the Bidding Procedures Order. (*See id.* at ¶12).

4866-2791-9781.1

I.      **Plaintiffs-Counterdefendants Advise The Court That The APA With Nexus Is In Estates' Best Interests And Offers Best Possible Economic Value, And The Court Agrees And Approves The Private Sale**

36.     Plaintiffs-Counterdefendants advised the Court that entering into the APA with Nexus was supported by the economic reality of Plaintiffs-Counterdefendants' chapter 11 cases. Because Plaintiffs-Counterdefendants' liabilities far exceed the value of their assets, the more than 40% increase over the Stalking Horse Bid constituted a material improvement for the estates. (*See* Mot., Dkt. 321, ¶15). Plaintiffs-Counterdefendants acknowledged and also advised the Court that the deposit offered by Nexus offered substantially more protection for the estates than what was required from the Stalking Horse Bidder or other potential bidders to participate at the auction– who were required to fund only an approximate 5% deposit. (*See id.*at ¶15).

37.     Plaintiffs-Counterdefendants further represented to the Court that they believed*, inter alia*, that:  a) the APA represented fair value and the highest or otherwise best transaction available to Plaintiffs-Counterdefendants; b) the sale to Nexus was in the best interests of Plaintiffs-Counterdefendants and their estates, as Plaintiffs-Counterdefendants believed that it provided a greater recovery for Plaintiffs-Counterdefendants' estates than would be available by any other available alternative; and c) that "proceeding expeditiously with the sale to [Nexus] will preserve the value of the Debtors' operations and ensure that the Debtors maximize the value of their estates for all of their constituents." (*See Id.* at ¶¶17, 27–29).

38.     Plaintiffs-Counterdefendants advised the Court that Nexus was a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that "[t]he Debtors and the Purchaser [Nexus] entered into the Purchase Agreement without collusion, in good faith and after extensive arm's length negotiations." (Mot., Dkt. 321, ¶35).

39. Plaintiffs-Counterdefendants advised the Court that they had consulted with UMB Bank, N.A., in its capacity as successor Bond Trustee under the Bond Indentures and the successor Master Trustee under the Master Indenture (the "<u>Trustee</u>") and that the Trustee supported pursuing a private sale with Nexus in accordance with the APA. (Mot., Dkt. 321, ¶14).

**B.      Plaintiffs-Counterdefendants Promise Under The APA To Cooperate, Act In Good Faith, And Provide Records And Site Access, Among Other Things**

40. As a material term under the APA, the assets Nexus purchased included a) the Real Property; b) all improvement on the Real Property; c) to the extent assignable, all intangible property rights related to the Businesses at the Locations, including any warranties and guaranties, zoning approvals, business permits and systems used in support of the Business; d) all tangible personal property owned by Sellers and utilized in the operation of the Business, including all machinery and equipment of Sellers utilized in the business; e) all inventory of Sellers utilized in the operation of the business; f) all Assumed Contracts (which include the Residency Agreements); g) all of Sellers' National Provider Numbers ("<u>NPI</u>") and any other applicable provider numbers with any state or other issuer or government body; h) all commercial occupancy leases or other agreements (and any amendments or modifications thereto) affecting the Real Property to which Sellers are a party and by which any person or other entity is entitled to occupy or otherwise use any portion of the Real Property, together with any and all right to receive payments of rent or other charges thereunder and accruing on and after the Closing Date, and i) all of Sellers' right title and interest in and to the IT assets. (*See* Mot., Dkt. 321, ¶22 (summarizing APA material terms) & Ex. A (the APA)).

41. Among the Covenants set forth in the APA, Section 6.02 provided, *inter alia*, that:

4866-2791-9781.1

[f]rom the Execution Date until the Closing Date, sellers shall during normal business hours and without interruption of operations: a) afford Nexus and its Representatives full and free access to and the right to inspect and appraise all of the Real property, properties, assets, premises, books and records, Contracts and other documents and data related to the business; and b) furnish Nexus and its Representatives with such financial operating and other data and information related to the Business as Nexus or any of its Representatives may reasonably request. (APA, § 6.02).

42.     Section 6.08 of the APA required both parties to use "commercially reasonable efforts" to expeditiously satisfy the closing conditions set forth in Article VII of the APA. (*Id.* at § 6.08).

43.     Section 6.13 of the APA required each party to exercise "good faith and fair dealing" to take the actions necessary or appropriate to satisfy all conditions to Closing and to consummate the Closing under the APA. (*Id.* at § 6.13).

44.     Section 7.02(a) of the APA specified, as one of the conditions to the obligations of Nexus as buyer, that Plaintiffs-Counterdefendants "shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement. . . ." (*Id.* <u>at §</u> 7.02(a)).

45.     The APA did not provide a date certain for closing. Rather, Section 3.01 provided that closing would occur "no later than the close of business on the first (1st) calendar date of the month that occurs after five (5) business days following the date on which conditions to Closing set forth in Article VII are either satisfied or waived… [O]r at such other time, date or place as Sellers and Buyer may mutually agree in writing." (*Id.* § 3.01).

46.     As detailed herein, Plaintiffs-Counterdefendants have not satisfied the conditions to closing, nor have the parties agreed to any other time, date or place for closing in writing.

Nonetheless, Plaintiffs-Counterdefendants insisted Nexus close at a time when Plaintiffs-Counterdefendants not only failed to satisfy, but sabotaged material conditions precedent, and insisted that Nexus close even though it would be deprived of the value of the business it contracted to acquire, including because McKendree Village risks not having a viable license from CMS to operate.

## C.      The APA Expressly Envisions Specific Performance Where One Side Fails To Perform, Acknowledging Irreparable Damage

47.      Section 9.11 of the APA specifically acknowledges the right of one party to specific performance in the event the other party fails to fulfill its obligations, stating:

> The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled in law or in equity.

## D.      Nexus Has Fully Performed As The APA Requires

48.      Since the execution of the APA, Nexus has been working vigorously and diligently toward closing. When provided reasonable access—which Plaintiffs-Counterdefendants have at times withheld—Nexus and its Representatives have made extensive site tours at many of Debtors' sites all across the country. Nexus has sought all necessary records. Nexus has even received three (3) CHOWs to date, including for McKendree Village and Waynesboro Health and Rehabilitation Center. [9] Nexus has fully performed as the APA requires.

---

[9] *See* Letter from E. Green to F. Wardega dated Jan. 24, 2024, attached hereto as Ex.2.

4866-2791-9781.1

### E.     Plaintiffs-Counterdefendants Have Failed To Perform As The APA Requires

49.     By contrast, Plaintiffs-Counterdefendants have failed to perform as the APA requires. In particular, they have failed to satisfy conditions precedent to closing and have failed to take required steps necessary to preserve the value of Nexus' bargain.

### F.     Plaintiffs-Counterdefendants Have Left McKendree Village Facing The Risk Of Termination By CMS

50.     McKendree Village is a Nursing Home located at 4347 Lebanon Pike, Hermitage, Tennessee 37076.

51.     McKendree Village is presently subject to a termination process being pursued by CMS.

52.     Because of regulatory violations and life safety code issues, including approximately 87 complaints of patient care abuse, McKendree Village already has failed a survey, as well as a re-survey, both of which were performed by CMS, including one on December 21, 2023.[10] That means that if McKendree Villlage remains on CMS' termination track–unless this is resolved by April 4, 2024–it stands to lose its license from CMS.

53.     By letter dated January 30, 2024, Nexus advised Debtors that it was clear that CMS certification issues "are clearly not resolved at McKendree Village" and advised Plaintiffs-Counterdefendants that it was "imperative" that they keep Nexus advised of developments at McKendree Village "in real time." (Ex. 3).

---

[10] *See* Letter from E. Green to F. Wardega dated Jan. 30, 2024, attached hereto as Ex. 3

4866-2791-9781.1

54.     Nexus understands that Plaintiffs-Counterdefendants filed a Plan of Correction with CMS. However, this Plan of Correction has not been accepted, and instead remains open. McKendree Village also filed an Independent Informal Dispute Resolution Request (the "<u>IIDR</u>"), but this too remains open.

55.     CMS would be expected to do a re-visit to McKendree Village before it would accept the Plan of Correction. As of this date, Nexus understands that CMS has not scheduled a visit.

56.     Therefore, unless and until the Plan of Correction is accepted or disputes are resolved through the IIDR process, McKendree Village remains at risk of losing its license from CMS to operate as a residential healthcare facility as of April 4, 2024.

57.     The APA cannot close when this essential facility remains at risk of termination. This state of affairs is entirely Plaintiffs-Counterdefendants' fault and responsibility. Nexus, of course, had nothing to do with McKendree Village's dire problems.

**G.     Defendant Debtors Have Failed To Provide Ohio HVAC Reports, Resulting In Nexus' Ohio CHOW Application Being Denied As "Incomplete"**

58.     It is essential that all residential healthcare facilities provide heating, ventilation and air conditioning that complies with state regulations.

59.     Ohio requires that an applicant for a CHOW file a signed, dated letter on company letterhead from an HVAC company that states the facility's heating and cooling systems are in good working order.

4866-2791-9781.1

60. Plaintiffs-Counterdefendants have refused to provide this essential HVAC Report paperwork demonstrating such compliance, despite repeated requests by Nexus.

61. Nexus even offered to send in its own HVAC professionals and to pay for those reports to ensure compliance, yet Plaintiffs-Counterdefendants refused. (Ex.2).

62. Plaintiffs-Counterdefendants' failure to provide the HVAC Report is particularly unjustifiable and inexplicable since Ohio law requires an operator of a residential patient facility to keep a copy of HVAC Reports.

63. Plaintiffs-Counterdefendants' failure to provide Nexus with the HVAC Report has indisputably hindered Nexus' ability to obtain approval for its CHOW application in Ohio. Indeed, on February 9, 2024, Ohio Regulators denied Nexus' CHOW application as being incomplete because of the failure to include the requisite HVAC Report.[11]

## H. Failure To Provide Essential Documentation And Site Access

64. Plaintiffs-Counterdefendants have repeatedly failed to provide necessary documentation and information. This includes, for example, the names of Plaintiffs-Counterdefendants' administrators for various sites.

65. There are approximately 50-70 communications where Nexus has pressed for information it needs, and under the APA has a right to have, where Plaintiffs-Counterdefendants have responded by stonewalling or refusal.

---

[11] *See* Letter from B. Vanderhoff, Ohio Department of Health, to T. Moore dated Feb. 9, 2024, attached hereto as Ex. 4.

4866-2791-9781.1

66. On January 24, 2024, Nexus provided Plaintiffs-Counterdefendants a Breach Notice Regarding Cooperation and Failure to Provide Notice of Potential Material Adverse Effects (the "January 24, 2024 Letter"). (Ex. 2). As the January 24, 2024 Letter made clear, Nexus had tried in earnest to enlist Debtors' cooperation in order to complete the numerous regulatory filings that need to be completed pursuant to Section 5.07 of the APA, yet were still missing a list of items and deliverables from them, including, inter alia, a) proof that the unpaid fine from June 7, 2023 for the Florida Assisted Living Facility; b) key employee information regarding the Florida Home Health Agency; c) HVAC Reports for both Ohio assisted living facilities, key employee information, fax numbers and Plaintiffs-Counterdefendants' signed consent to the skilled nursing facility applications; d) confirmation regarding the Ohio skilled nursing facility Medicaid as to whether the Plaintiffs-Counterdefendants followed the required steps to initiate a CHOW and assign it to Nexus' representative before closing; e) information as to whether the Tennessee skilled nursing facility provides dialysis services and, if so, whether these are provided bedside, and, if so, the number of beds where this service is provided. Nexus stressed that it had requested information as of January 24, 2024 and that much of this information should have been at Plaintiffs-Counterdefendants' fingertips. (*Id*).

67. Plaintiffs-Counterdefendants also withheld necessary information about McKendree Village, refusing to provide updates, copies of recent surveys and copies of letters from CMS and State Licensing Authorities. (Exs. 2, 3). This was an apparent effort to conceal the dire circumstances there.

68. If, as is presently true, McKendree Village's license is in peril, this constitutes a "Material Adverse Effect" under the APA. (APA, Ex. 1 at p. 7).

69.     Nexus' January 24, 2024 Letter also documented that Plaintiffs-Counterdefendants had forced Nexus to wait weeks to even schedule appointments for access to sites. (Ex. 2).

70.     Nexus January 24, 2024 Letter further noted that Plaintiffs-Counterdefendants had improperly tried to shift the blame for their breaches of the APA to Nexus, noting Plaintiffs-Counterdefendants had sent numerous threating letters in that vein. (Ex. 2).

71.     That "January 24, 2024 Letter also cautioned Plaintiffs-Counterdefendants against terminating the APA under false pretenses (Ex. 2), which is exactly what Plaintiffs-Counterdefendants have since done. (*See* Dkt. 516).

72.     Despite Nexus identifying specific failures by Plaintiffs-Counterdefendants which impeded closing, Plaintiffs-Counterdefendants, by letter of January 28, 2024 (the "January 28, 2024 Letter"),[12] simply "reject[ed] in full" all statements in the January 24, 2024 Letter and, without explanation and in error, stated that it "dispute[d] that any of your previously outstanding requests have anything to do with Buyer's ability to timely close the transaction." (Ex. 5). As the preceding paragraphs show, this empty assertion was pure nonsense, and is in and of itself further evidence of Plaintiffs-Counterdefendants breach of their duty of good faith and fair dealing. In the January 24, 2024 Letter, Debtors did acknowledge that Nexus had made all of its CHOW and other filings, showing Nexus' compliance with this duty.

---

[12] The January 28, 2024 Letter is attached hereto as Ex. 5.

## I. Plaintiffs-Counterdefendants Insist On March 1 Closing Despite Their Failures To Satisfy Conditions To Closing

73. Despite Plaintiffs-Counterdefendants' failures of performance, which left highly material and essential matters unresolved and frustrated Nexus' ability to close, in or about mid-January 2024, Plaintiffs-Counterdefendants began to insist that the transaction close on March 1, 2024.

74. Plaintiffs-Counterdefendants insisted that Nexus take all properties "as is", despite the risks of McKendree Village's termination by CMS, Ohio's failure to certify because of the Plaintiffs-Counterdefendants' failure to provide HVAC Reports, and their failure to provide information about numerous other facilities, among other problems. In other words, Plaintiffs-Counterdefendants wanted Nexus to pay the same $57.5 million it would owe if all conditions precedent were satisfied and all properties were in proper condition, when many were not. This was contrary to the APA's terms (*see* APA §7.02(a)) and would have deprived Nexus of the benefit of its bargain.

75. Moreover, Plaintiffs-Counterdefendants' failures as to McKendree Village and the Ohio HVAC Reports each constituted a "Material Adverse Effect" under the APA. (*See* APA, p. 7 (defining "Material Adverse Effect")).

76. Plaintiffs-Counterdefendants at no time offered any adjustment of purchase price, escrow arrangement or other accommodation to account for the unresolved issues.

77. For example, Nexus offered to sign an amendment to the APA that would carve out the Florida Home Health Agency (Ex. 2), yet Plaintiffs-Counterdefendants refused.

4866-2791-9781.1

78.     Nexus made clear to Plaintiffs-Counterdefendants that it would close as expeditiously as possible once the unresolved issues were successfully addressed. Nexus also made clear it believed that with Debtors' cooperation, this could be achieved by April 2024, enabling an early May 2024 closing.

**J.     Plaintiffs-Counterdefendants, Without Cause, "Terminate" The APA Under False Pretenses, So They Can Pursue A Secret, Sweetheart Deal They Surreptitiously Pursued With The Back Up Bidder, In Breach Of Contract And Violation Of Their Duty Of Good Faith And Fair Dealing**

79.     On February 7, 2024, Plaintiffs-Counterdefendants purported to terminate the APA (the "Termination Letter").[13] They also filed their *Notice of (I) Debtors' Termination of Asset Purchase Agreement With Purchaser; (II) Debtors' Reversion to Back-Up Bidder; and (III) Filing Third Amendment to Asset Purchase Agreement* (the "Termination Notice"). (Dkt.516).

80.     The Termination Letter misleadingly asserted that Nexus had failed to timely file for permits and regulatory approvals (Ex. 6), when any such delays or failures were entirely due to Plaintiffs-Counterdefendants' breaches, including as to McKendree Village and as to failures to provide documentation and permit site visits.

81.     The Termination Notice attached the Third Amendment, which amended the asset purchase agreement entered into with Cascasis as Back Up Bidder dated August 4, 2023. (Dkt. 516). This Third Amendment noted that "the transaction contemplated by the Private Sale Agreement will not close by the contemplated deadline. . . ." (*Id*). Yet there was no "deadline."

---

[13] The Termination Letter is attached hereto as Ex. 6.

52

And while Debtors sought March 1, 2024, as a deadline, they unilaterally sabotaged any ability to close by that date by their failures and derelictions as described herein.

82.     The Third Amendment stated that within one (1) business day after execution of that document, *i.e.,* February 7, 2024, Cascasis as Back Up Bidder would provide an additional deposit of $2 million, yet, even if Cascasis did so, this is still far below what Nexus had deposited.

83.     The Third Amendment also provides that Cascasis as Back Up Bidder would personally guarantee at least $4.5 million in additional cash if Debtors did not recover at least $4.5 million of Nexus' $8 million deposit.

84.     Thus, it appears that Plaintiffs-Counterdefendants and Cascasis are using Nexus' substantial deposit to shore up Cascasis' economically inferior revised offer.

85.     The total consideration to Plaintiffs-Counterdefendants' estate remains below what Nexus would provide under the APA.

86.     As further evidence that Plaintiffs-Counterdefendants offered Cascasis sweetheart terms, while Debtors insisted Nexus take all properties—including McKendree Village—"as is" and close by March 1, 2024, they carved out McKendree Village from the obligations of Cascasis as Back Up Bidder. The Third Amendment provides that Plaintiffs-Counterdefendants must receive a clearance letter from CMS for McKendree Village as a condition precedent to closing.

4866-2791-9781.1

The Notice of Third Amendment provides that Cascasis can close in 10 days from that submission, which they claim would be February 17, 2024.[14]

87.     Yet if Nexus had been offered the same condition precedent to closing regarding McKendree Village, as Plaintiffs-Counterdefendants provided to Cascasis as Back Up Bidder, or if Plaintiffs-Counterdefendants had entered into some other mutually agreeable accommodation for McKendree Village, Nexus could also close by March 1, 2024. Plaintiffs-Counterdefendants are thus willing to accommodate Cascasis as Back Up Bidder when they would not treat Nexus the same, demonstrating their violation of their duty of good faith and fair dealing.

88.     As further demonstration of the pretextual nature of Plaintiffs-Counterdefendants' termination, while Plaintiffs-Counterdefendants claimed the right to terminate because Nexus was not prepared to close on March 1, 2024, because of open issues with McKendree Village, the closing for their alternative deal with Cascasis as Back Up Bidder would seem likely to close well beyond that date. Nor would Cascasis as Back Up Bidder have the HVAC Reports necessary for the Ohio CHOW, which would further delay the Plaintiffs-Counterdefendants closing of the APA.

89.     In addition, while Debtors advised Nexus that March 1 was a necessary closing date because Cascasis as Back Up Bidder will not agree to extend its backup date (which is March 7, 2024), there would be no need for such a deal if Debtors simply performed their end of the bargain with Nexus and enabled the existing, Court-approved transaction to close. It is neither fair, nor

_____

[14] Since CMS has yet to schedule the necessary re-visit, accept Plaintiffs-Counterdefendants' Plan of Correction for McKendree Village or resolve the IIDR for McKendree Village, this February 17, 2024 date seems unachievable, if not deceptive.

54

necessary, for Plaintiffs-Counterdefendants to punish Nexus (and reward Cascasis) for Cascasis' intransigence.

90. By terminating the APA without right, Plaintiffs-Counterdefendants have breached that agreement.

91. Because Nexus had complied with its obligations under the Court-Approved APA, Plaintiffs-Counterdefendants' breach is also a violation of the Sale Order.

**K.      Nexus Has Been And Will Be Grievously Damaged Absent Immediate Relief Enforcing And Protecting Its Contract Rights**

92. Nexus stands to lose the benefit of its hard-fought bargain if Plaintiffs-Counterdefendants are allowed to terminate the APA and instead sell the properties to Cascasis as Back Up Bidder, as Plaintiffs-Counterdefendants now seek to do.

93. The properties at issue that Plaintiffs-Counterdefendants now attempt to transfer to the Back Up Bidder are unique and valuable and would otherwise rightly belong to Nexus after closing in the ordinary course.

94. Additionally, Plaintiffs-Counterdefendants are improperly attempting to seize and convert Nexus' $8 million deposit.

95. The parties recognized in the APA itself that conduct in breach by one party would irreparably injure the other. (APA, Ex.1, §9.11).

96. Absent specific performance and injunctive relief barring the seizure and conversion of the Deposit and alternative transfer of the Assets to the Back Up Bidder, Nexus will be irreparably harmed.

4866-2791-9781.1

97.     Nexus has fully performed its obligations under the APA.

## COUNT I

### (Specific Performance of the APA)

98.     Nexus realleges and incorporates Paragraphs 1-97 as if fully set forth herein.

99.     The APA, which the Court previously approved on November 8, 2023, specifically recognizes a right to specific performance in the event Debtors do not perform their obligations under the APA in accordance with the terms thereof (APA, Ex.1, § 9.11).

100.    Section 9.11 of the APA specifically acknowledged that the failure by Debtors to perform their obligations in accordance with the APA's terms would cause irreparable damage.

101.    Section 9.11 of the APA expressly recognizes that Nexus' right to specific performance is in addition to an independent of any other remedy it may have in equity or law.

102.    Specific performance is independently justified because the properties purchased by Nexus under the APA include the Real Properties which are each unique and for which money damages alone would not suffice.

103.    The APA is a valid and enforceable agreement.

104.    As outlined above, Debtors have not performed their obligations under the APA in accordance with its terms.

105.    Nexus has fully performed its obligations under the APA to date and is ready, willing and able to perform any and all obligations it has or may have under the APA.

4866-2791-9781.1

106.     Money damages alone also may not suffice because Plaintiffs-Counterdefendants are debtors in bankruptcy and have represented that they lack funds.

107.     The balance of equities favor Nexus, as it at all times has acted in good faith and consistent with the APA and Sale Order. By contrast, Plaintiffs-Counterdefendants have acted inequitably including by acts described above which have frustrated and prevented Nexus' ability to close, by a) insisting that Nexus take the Assets "as is" and close at the purchase price provided in the APA, despite Plaintiffs-Counterdefendants not having met their obligations as to McKendree Village, the Ohio HVAC Records, the provision of documents and information, and the facilitation of site visits; b) attempting to seize and convert Nexus' Deposit; c) improperly terminating the APA; and d) providing the Back Up Bidder with sweetheart terms, while insisting Nexus close despite promised properties being in jeopardy.

Wherefore, Nexus prays that this Court:

1.     Grant Nexus specific performance of the APA and order Plaintiffs-Counterdefendants to comply with the APA, including, *inter alia*, by cooperating with Nexus in completing tasks necessary to closing and by forbearing from seizing or converting its $8 million deposit;

2.     Award Nexus its costs;

3.     Award Nexus prejudgment interest;

4.     Award Nexus its attorney's fees, as provided by law; and

5.     Award such other and further relief as is just and equitable.

## COUNT II

**(Injunctive Relief, Including A Preliminary Injunction To Prevent 1) An Alternative Sale Of Assets Subject To Nexus' APA and 2) Misuse of Nexus' Deposit)**

108.     Nexus realleges and incorporates Paragraphs 1-107 as if fully set forth herein.

109.     Absent injunctive relief, including a preliminary injunction, Plaintiffs-Counterdefendants will proceed to terminate Nexus' rights under the APA and transfer all benefits

57

Nexus rightfully expects to enjoy under the APA to the Back Up Bidder instead, pursuant to the Third Amendment.

110.    Absent injunctive relief, including a preliminary injunction, Plaintiffs-Counterdefendants will also seize, without right, and convert Nexus' $8 million deposit.

111.    The APA, which has been approved by Court Order, provides Nexus with clear contract rights in need of protection.

112.    The same irreparable damage which the parties recognized in Section 9.11 of the APA justifies specific performance also supports injunctive relief, including a preliminary injunction and permanent injunction, to prevent Plaintiffs-Counterdefendants from entering into an asset purchase agreement with Cascasis as Back Up Bidder or any other party for the Assets, and also to prevent Plaintiffs-Counterdefendants from misusing the Deposit.

113.    Nexus is likely to succeed on the merits of its claims, entitling it to a preliminary injunction.

114.    The balance of harms favors Nexus, as it has acted in good faith and complied with its obligations under the APA, while Plaintiffs-Counterdefendants have acted inequitably, breached their obligations, and breached their duty of good faith and fair dealing under APA.

115.    The public interest favors an injunction, including a preliminary injunction.

116.    Nexus is entitled to injunctive relief, including a preliminary injunction.

117.    Injunctive relief is justified under 11 U.S.C. § 105, Fed. R. Bankr. P. 7065 and Fed. R. Civ. P. 65.

Wherefore, Nexus prays that this Court:

1.  After hearing, grant its motion for a preliminary injunction in its favor and against Plaintiffs-Counterdefendants which would 1) enjoin them from entering into any agreement to sell the Assets which are subject to the APA to any other party, including, but not limited to Cascasis; and 2) enjoin Plaintiffs-Counterdefendants from any misuse of Nexus' $8 million deposit, including the conversion of same;

2.  After trial, grant it permanent injunctive relief;

3.  Award Nexus its costs;

4.  Award Nexus its attorney's fees, as allowed by law; and

5.  Grant such other relief as this Court deems just and equitable.

## COUNT III

### (Breach of Contract)

118.  Nexus realleges and incorporates paragraphs 1-117 as if fully set forth herein.

119.  The APA is a valid and binding contract between Plaintiffs-Counterdefendants and Nexus, which has been approved by the Court.

120.  Nexus performed all of its obligations under the APA.

121.  Debtors have breached the APA.

122.  Debtors breaches include, *inter alia*, their breach of the duty of good faith and fair dealing and the duty to cooperate.

123.  Nexus has been damaged as a direct and proximate result of Debtors' breach.

Wherefore, Nexus prays that this Court:

1.  Award Nexus damages for Debtors' breach of contract;

2.  Award Nexus its costs;

3.  Award Nexus its attorney's fees, as allowed by law; and

4.  Grant such other relief as this Court deems just and equitable.

4866-2791-9781.1

Dated:  February 16, 2024

*/s/ David W. Houston, IV*
**BURR & FORMAN LLP**
David W. Houston, IV
222 2nd Ave S. #2000
Nashville, TN 37201
Telephone: 615.724.3200
E-mail: dhouston@burr.com

James P. Roberts (*pro hac vice* admission pending)
Burr & Forman LLP
420 20th St. N, Suite 3400
Birmingham, AL 35203
Email: jroberts@burr.com

*Attorneys for Defendant Nexus Capital XIII, LLC*

60

## <u>VERIFICATION</u>

I, Eli Schwartz, am Managing Member of Defendant-Counter-Plaintiff Nexus Capital III, LLC ("<u>Nexus</u>"). I have personal knowledge of the facts alleged in Nexus' foregoing Answer, Affirmative Defenses and Counterclaim For Specific Performance, Injunctive Relief, Including a Preliminary Injunction, And Damages, and if called as a witness could testify to the truth of those allegations. Based on that knowledge, I believe those allegations to be true and correct.

_____

Dated: February 16, 2024

4871-5805-5589.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2024, I filed a true and correct copy of the foregoing

via the Court's CM/ECF system, which will notify and serve all counsel and parties of record.


*/s/ David W. Houston, IV*
Of Counsel

4866-2791-9781.1